WILLIAM J. SCHMITZ and DOROTHY M. SCHMITZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schmitz v. Commissioner
Docket No. 6573-77.
United States Tax Court
T.C. Memo 1980-390; 1980 Tax Ct. Memo LEXIS 200; 40 T.C.M. (CCH) 1251; T.C.M. (RIA) 80390; September 16, 1980, Filed Patrick F. Daly and Michael J. Cannon, for the petitioners. Allan E. Lang, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined the following deficiencies and additions to tax for petitioners for the taxable years indicated: [1]
Addition to Tax
Year
Deficiency
section 6653(b) [2]
1968
$ 6,863.19
$ 3,431.19
1969
20,164.80
10,082.40
1970
1,118.80
559.40
*201 Concessions having been made, the issue for determination is whether petitioners received taxable income for the years 1968, 1969 and 1970 in the respective amounts of $25,000, $50,000 and $4,000. [3]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation and the attached exhibts are incorporated herein by reference. Petitioners are husband and wife. At the time the petition in this case was filed, petitioners resided in Aurora, Illinois. During the years 1968, 1969 and 1970, petitioner William J. Schmitz (hereinafter referred to as "petitioner") was employed at Austin Western Company ("Austin Western") in Aurora, Illinois. Austin Western, a division of Baldwin-Lima-Hamilton Corporation, manufactures and assembles construction and earth-moving equipment. During 1968, 1969 and 1970, petitioner was employed as an expediter in Austin Western's purchasing department. *202 Petitioner's duties entailed those normally associated with being a buyer; his function was to procure various parts Austin Western needed in order to manufacture and assemble its equipment: e.g., cabs, tires, bearings, fasteners and fittings. During the years in question petitioner received the following payments from the entities listed below: 1968
1969
1970
Broadway Coil Co.
$ $ $1,160.00
Industrial Components Co.
3,037.37
2,821.89
Whitley Bearing
1,301.65
2,211.62
472.20
These payments were given to petitioner in exchange for the purchase orders he placed with the respective companies on behalf of Austin Western. In other words, the payments received by petitioner were what are commonly known as kickbacks. [4]
*203 During the latter part of 1967, petitioner contacted Alex Rottner ("Rottner"), an old acquaintance of petitioner, who had substantial experience in the equipment parts industry. Petitioner was curious as to whether Rottner could assist him in obtaining certain high-pressure fittings for Austin Western. Petitioner gave Rottner the name and telephone number of an individual employed at World Wide, a wholesale parts supplier company, and the part number of the particular high-pressure fitting he desired. Petitioner asked Rottner if he would call the individual and ascertain the part's price. Rottner obliged and relayed the information to petitioner. World Wide was willing to give Rottner a "broker's discount" for any parts he purchased. The price he could obtain from World Wide was thus lower than that which was available to Austin Western as a manufacturer of equipment employing those parts. It was with this understanding that petitioner proposed to Rottner the following "middleman" arrangement: When Austin Western needed fittings, petitioner was to inform Rottner of the type and quantity required. Rottner in turn would obtain the parts from World Wide. Rottner would then *204 sell the parts to Austin Western at the normal retail price (i.e., the price to Rottner plus the broker discount). The arrangement was agreed to by petitioner and Rottner and commenced sometime during the latter portion of 1967 or early 1968. Petitioner and Rottner also agreed that a dormant company of Rottner's, the Mar Nan Company, would be utilized to effectuate the arrangement. Accordingly, during 1968, 1969 and 1970, petitioner placed orders with Mar Nan for the fittings Austin Western needed. Rottner would in turn order the fittings from World Wide. The parts were then either delivered by Rottner or drop-shipped by World Wide to Austin Western. Generally, the net profit (essentially the broker's discount less attendant expenses) was then split equally between petitioner and Rottner. During the period from January 9, 1968 to March 20, 1970, Baldwin-Lima-Hamilton Corporation, Austin Western Division, issued 59 checks totaling $456,489.49 payable to Mar Nan. The aggregate of those checks for each of those years were as follows: 27 checks dated January 9, 1968
to December 23, 1968
$147,319.98
23 checks dated January 9, 1969
to December 9, 1969
282,379.36
9 checks dated January 9, 1970
to March 20, 1970
26,790.15
Total
$456,489.49 *
*205 Upon receipt of each of the above checks, Rottner would match it with the invoice for the corresponding order. He would make a notation on the invoice of the cost of the parts sold (paid to World Wide) and any other expenses such as shipping charges. Rottner would then record the net profit on the invoice. Petitioner wished to receive his share of the proceeds to Mar Nan in cash. Consequently, Rottner would, upon depositing each check in his personal bank account, insure that sufficient cash was received for petitioner's share. During the years 1968, 1969 and the period from January 17, 1970, to March 12, u970, Rottner withdrew cash upon the deposit of the Baldwin-Lima-Hamilton checks in the respective amounts of $26,507.24, $56,228.71 and $4,676. After receiving the cash, Rottner would place petitioner's share in an envelope and deliver it to petitioner, either in the parking lot of a Holiday Inn midway between Rottner's and petitioner's homes, or at petitioner's office at Austin Western. These meetings occurred during 1968, 1969 and 1970. During 1968, 1969 and 1970, Rottner made cash payments *206 to petitioner in the respective amounts of $25,000, $50,000 and $4,000. These payments were not reported as income on petitioners' joint income tax returns for 1968, 1969 and 1970. Petitioner was fired from his job at Austin Western in March of 1970 after his arrangement with Rottner was discovered. On September 6, 1968, petitioner rented safe deposit box F 3784 at the Merchants National Bank of Aurora, Illinois. The rental contract for box F 3784 was transferred to box F 440 on July 25, 1969. Petitioner entered the respective boxes (F 3784 or F 440) 15 times in 1968, 42 times in 1969 and 12 times in 1970. After elimination of all inter-account transfers, petitioners' net deposits to all bank accounts during 1968 totaled $39,999.52. On June 13, 1968, petitioner received from the executor of his mother's estate the full amount of his distributive share of $4,072.05. Petitioners' son, Keith Schmitz, died in February of 1968. On February 27, 1968, a check for $2,211.68 and representing death benefits payable on the death of their son was mailed to petitioner from Metropolitan Life. The balance of Keith Schmitz's Austin Western credit union account on December 31, 1967 was *207 $2,010. OPINION This case essentially involves a determination of two witnesses' credibility. Petitioner denied ever receiving any amounts from Alex Rottner as part of an arrangement to share middleman profits generated primarily by Rottner's broker's discount. Rottner, on the other hand, testified as to the specifics of such an arrangement. Rottner stated that petitioner would place his Austin Western orders with Rottner's company, Mar Nan, and that any net profit inuring to Mar Nan from these sales was divided equally between petitioner and himself. As our findings of fact indicate, we accept Rottner's version. Aside from any mere failure on petitioners' part to carry their burden of proof, Welch v. Helvering, 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure, we found the testimony of Rottner persuasive. His testimony affirmatively demonstrated the existence of an arrangement between himself and petitioner to share the former's middleman's profits. Petitioner admits that during the years in question he procured high-pressure fittings from Mar Nan on behalf of Austin Western. Indeed, the parties have stipulated that from January 9, 1968, to *208 March 20, 1970, Baldwin-Lima-Hamilton Corporation issued 59 checks totaling $456,489.49 payable to Mar Nan. During those same years petitioner received unreported regular payments from other parts sellers in return for placing Austin Western's orders with them. Yet petitioner contends that for all of the purchase orders he gave to Mar Nan (almost a half-million dollars) he received nothing in return. In an attempt to add plausibility to this contention petitioner explained that he did not receive any payments for purchase orders from Mar Nan because of his friendship with Rottner; entertainment paid for by Rottner's former employer; anticipated future employment; and gifts from Rottner (which were recollected belatedly at trial). We found that this self-serving testimony was unworthy of belief and in no way assailed the testimony of Rottner to the contrary. The evidence of Rottner's cash withdrawals upon his deposit of Austin Western checks [5] buttresses the account Rottner gave. Rottner testified that petitioner was paid $25,000, $50,000 and $4,000 in cash during 1968, 1969 and 1970, respectively; Rottner obtained the cash for these payments upon the deposit of the Austin *209 Western checks which Mar Nan received. Rottner's witndrawals of cash upon the deposit of the Austin Western checks were $26,507.24, $56,228.71 and $4,676 for 1968, 1969 and 1970, respectively. These amounts dovetail with the payments which Rottner stated he made to petitioner during each of those years. The discrepancies between the withdrawn amounts and the amounts paid are relatively insignificant and are most likely attributable to Rottner's stated need for petty cash. The evidence concerning petitioner's net bank deposits for 1968 and his frequent visits to his safe deposit boxes also lends credence to Mr. Rottner's version of what transpired. Starting with petitioner's net deposits to bank accounts in 1968 ($39,999.52), and subtracting therefrom petitioner's gross income ($14,375.44 per his return), the payment from his mother's estate ($4,072.05), payments from Industrial Components and Whitley Bearing ($4,339.02), death benefits ($2,211.68) and his son's credit union balance ($2,010.00), leaves $12,991.33 in unexplained bank deposits. By September 6, 1968, the *210 date petitioner rented a safe deposit box, Rottner's cash withdrawals from the depositing of Austin Western checks totaled $14,435.50. We believe it is reasonable to assume that the payments to petitioner by that time were in the general vicinity of that amount. During the remainder of 1968, and for the years 1969 and 1970, petitioner visited one or the other of his safe deposit boxes 15, 42 and 12 times, respectively. In addition, interestingly enough, there is no evidence of unexplained bank deposits for the years 1969 and 1970. The number of visits to the safe deposit box increased significantly for 1969, the year in which petitioner received the greatest total amount of payments ($50,000). It is also probative that the number of visits to the safe deposit box declined significantly in 1970, the year in which petitioner received only $4,000 from Mar Nan via Rottner. Petitioner was fired from Austin Western in March of 1970; the payments from Rottner would logically have ceased sometime shortly thereafter. Indeed, petitioner made no visits to the safe deposit box between June 12, 1970, and December 31, 1970. [6]
*211 Petitioner's assertion that the box was used to store coins he collected can be characterized as unconvincing at best. There was no reason offered to explain the varying number of visits during the years in question. Petitioner claimed to have been collecting coins since the 1930's yet did not see fit to open up a safe deposit box until September of 1968. Viewing this evidence in its entirety, it is a reasonable inference that petitioner's frequent trips to his safe deposit box during the years in question were occasioned by his receipt of the payments from Rottner. Finally, petitioner admitted that he met Rottner regularly in the parking lot of a Holiday Inn approximately 35 miles away from his home. Petitioner denies, however, that these visits were for the purpose of collecting his share of the profits from the Mar Nan arrangement. Instead, petitioner avers that these visits occurred during 1971, 1972 and 1973. According to petitioner, he received these installments in the form of cash or check. Again, we find petitioner's testimony totally unconvincing. Petitioner could provide no adequate explanation as to why it was necessary to drive 35 miles for what were purportedly *212 regular monthly loan payments. The contradictory testimony by petitioner's son that he accompanied his father on his rendezvous with Rottner clearly did not bolster petitioner's account. On direct examination, petitioner's son initially testified that the meetings with Rottner at the Holiday Inn occurred in 1968, 1969 and 1970, the years which Rottner testified they occurred. This testimony was reaffirmed on cross examination. However, petitioner's son retracted his initial testimony when he belatedly realized that he had made a mistake because the meetings occurred (according to his revised version) after his father lost his job. After carefully considering all of the evidence, we have little trouble in finding that petitioners have failed to carry their burden of proof. Accordingly, we hold that petitioners received unreported payments for the years 1968, 1969 and 1970 in the respective amounts of $25,000, $50,000 and $4,000. Decision will be entered under Rule 155.
Footnotes
1. Respondent does not seek to impose the addition to tax under section 6655(b), I.R.C. 1954↩, against petitioner Dorothy M. Schmitz.
2. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, except as otherwise specifically indicated.↩
3. Petitioners concede various items listed in the statutory notice of deficiency; petitioner William J. Schmitz has also conceded the addition to tax under section 6653(b) for each of the years in question, applicable to any dificiency determined herein.↩
4. Petitioner did not report these payments on his tax returns for each relevant year. The failure to do so gave rise to the filing by the United states Attorney of a three-count information in December of 1974 with the United States District Court for the Northern District of Illinois. That information charged petitioner with three separate violations of section 7201, namely, for each of the years 1968, 1969 and 1970. Petitioner subsequently pled guilty to the three counts charged in that information.↩
*. This total is incorrectly set forth in the Stipulation as $456,489.15.↩
5. Baldwin-Lima-Hamilton Corporation, of which Austin Western was a division, was the actual drawer of these checks.↩
6. The exact dates and times are found on extrance tickets to the safe deposit boxes; all of these tickets were contained in an exhibit attached to the first stipulation of the parties.↩